436 F.2d 227
 141 U.S.App.D.C. 73
 The BLACK UNITED FRONT, Petitioners,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent.
DISTRICT OF COLUMBIA, Petitioner,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent.
DEMOCRATIC CENTRAL COMMITTEE OF the DISTRICT OF COLUMBIA and
Bruce J. Terris, Petitioners,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent.
 Nos. 24396-24398.
 United States Court of Appeals, District of Columbia Circuit.
Argued June 27, 1970, Order Filed June 27, 1970.
Opinion Filed July 2, 1970, Petition for Reconsideration
Denied July 29, 1970.
 
 Mrs. Jean Camper Cahn, with whom Mr. Edgar S. Cahn, Washington, D.C., was on the petition and motion in No. 24,396, argued on behalf of all petitioners.
 Messrs. Hubert B. Pair, Acting Corporation Counsel, and C. Belden White, II, Asst. Corporation Counsel, were on the petition and motion in No. 24,397.
 Mr. Landon Gerald Dowdey, Washington, D.C., was on the petition and motion in No. 24,398.
 Mr. Douglas N. Schneider, Jr., Washington, D.C., General Counsel, Washington Metropolitan Area Transit Commission, argued on behalf of respondent.
 Before ROBINSON, MacKINNON and WILKEY, Circuit Judges.
 PER CURIAM:
 
 
 1
 In the late afternoon of last Saturday, June 27, petitioners filed in this court their respective petitions for review of Order No. 1052 of the Washington Metropolitan Area Transit Commission, the respondent. That order, published on the previous day, granted D. C. Transit System, Inc., certain fare increases, to take effect at 12:01 a.m. on Sunday, June 28, for transportation service in the District of Columbia and nearby Maryland. Accompanying each petition for review was a motion seeking a stay of Order No. 1052 on a common ground, later detailed herein. With a serious challenge to the order's imminent operation, we convened an emergency hearing on the motions, at which all parties were represented, and thereafter ordered a temporary stay. Now, in this opinion, we delineate the jurisprudential basis upon which our stay order was predicated.
 
 
 2
 * Order No. 1052 emanated from a proceeding before the Commission, of some three-months duration, to which one of our petitioners, the District of Columbia, was a formal party.[1] Officially announced at approximately 11:00 a.m. on Friday, June 26,[2] information about the order gradually spread to the general public, as the day wore on, through dissemination of its purport by news media. The Commission's office, however, closed for the weekend at 4:45 p.m. on that day while the order, by its terms, was to become alive about 37 hours after its proclamation. Thus there remained a period of only about six hours between release of the order and commencement of its operation during which the Commission's office was open for business.
 
 
 3
 By affidavit and representations at the hearing, petitioners portrayed vividly a wave of public resentment to the fare elevations the Commission's order made possible. It is not startling, then, that attacks on the order would be launched, and attempts made to head off the increases. There was, moreover, an avenue, legally available to those affected by the order, along which efforts of that character might be pursued.
 
 
 4
 The Commission is a creature of the Washington Metropolitan Area Transit Regulation Compact,[3] by which its powers and responsibilities are given general definition. Section 16 of the Compact authorizes 'any person affected by any final order or decision of the Commission' to file with the Commission an application for reconsideration of such aspects of the order or decision as are specifically challenged as erroneous.[4] That section also provides for a speedy resolution of the issues tendered for reconsideration,[5] and for an automatic stay of the order or decision, upon the 'filing' of such an application, until final action thereon.[6] Petitioners sought to utilize these provisions as the vehicle to an administrative reexamination of Order No. 1052 and a suspension of its execution in the meantime.
 
 
 5
 Each petitioner completed an application for Commission reconsideration on June 27, the day following announcement of the order.[7] By then, as already indicated, the Commission's office was shut down for the weekend, with reopening scheduled some 32 hours after the order was to take effect. In this dilemma, two petitioners deposited their applications in the Commission's closed office and notified the Commission's Chairman of that course of action; the two joint petitioners remaining informed the Chairman of their desire to file their application too. In each instance the Chairman responded, in substance, that because of the weekend closing the applications must await handling when the office resumed business on the following Monday morning.[8] The proceedings in this court were then instituted, with the outcome we have mentioned.
 
 II
 
 6
 Although some of the arguments for and against judicial stay of Order No. 1052 range much wider,[9] we find it necessary to focus upon but one question: whether, on June 27, there was a 'filing' with the Commission of one or more of the applications for reconsideration. If so, as we have pointed out, the filing, in consequence of Section 16 of the Compact, precipitated a stay of the order until final action by the Commission on reconsideration.[10] In our view, the events transpiring on June 27 constituted such a filing, and that filing, in turn, barred inauguration on June 28 of the fare increases the Commission had approved.[11]
 
 
 7
 We do not reach the question whether the after-hours delivery of an application for reconsideration to the Commission's office amounts, without more, to a Section 16 filing,[12] for here there was a great deal more. On the one hand, the Commission maintains a schedule of office hours, established by its regulations, and filing of the applications was undertaken outside those hours. On the other hand, the Chairman of the Commission, we reiterate, was apprised of each of the three applications, of physical deposit of two of them in the Commission's office, and of the ongoing endeavor to file the third. Not to be ignored, either, are the self-evident objectives underlying Section 16, or their obvious role in the situation at hand.[13] With these considerations, we think our 1969 Yohalem decision[14] charts clearly the decisional course we must sail in the litigation at bar.
 
 
 8
 In Yohalem, an applicant for reconsideration slid his application under the door of the Commission's office several minutes after its closing on the 30th day after the publication of an order, and the application was actually seen there by the Commission's Executive Director about an hour later. The Commission treated the application as filed on the next day and, consequently, as coming too late to require attention by the Commission.[15] We rejected that position and held 'that under the circumstances of this case, where the party seeks to raise issues of importance to the public, where the submission was only a few minutes late, and where the papers came to the attention of a responsible official of the Commission on the day tendered, even if only by accident, the Commission's refusal to treat the application as timely is an abuse of discretion.'[16]
 
 
 9
 When Yohalem was before us, we were mindful of cases deciding that after-hours filings are ineffective, but found it 'not surprising that exceptions to the rule appear when cases involving the public interest arise.'[17] We looked to two of our earlier decisions[18] and 'deduce(d) from their holdings the principle that when the public interest is involved and when the filing comes to the attention of responsible officials of the agency on the day tendered, a minor failure to comply with 'normal business hours' should not bar acceptance of the filing as of the day it was actually made.'[19] Thus we recognized that an ordinarily reasonable requirement that filings be made during established business hours might well succumb to the exigencies of a matter of great public concern. And because, in Yohalem, the Commission had not given that consideration its just due, we ourselves took the action necessary to rectify the error in refusing to regard the application in question as timely filed.[20]
 
 III
 
 10
 The case before us, in its essential aspects, is similar to Yohalem. Here, as there, the petitioning parties 'challenge( ) the recent increase in bus fares, a question of great importance to the general public;'[21] here, as there, the applications posing the challenges were brought home, though outside business hours, to an officer of the Commission.[22] We realize that in Yohalem the deposit of the application and the notice thereof occurred shortly after hours on a regular business day, while here similar events transpired on a day the Commission is regularly closed. By our appraisal, that difference is too trivial to distinguish the two cases, and to do so on that basis would frustrate important aims of Section 16 in the context of the circumstances of this case.
 
 
 11
 As we construe Section 16, the stay of an order, by the filing of an application for its reconsideration, is automatic, immediate and mandatory.[23] Only if the applicant consents in writing to continued operation of the order is the stay avoided, and not even then if the Commission directs otherwise.[24] The plain purpose of these provisions is to maintain the status quo-- the situation immediately prior to the time the order is to become effective-- pending the Commission's final action on the application,[25] unless both the applicant and the Commission make a countervailing assessment as to what the situation demands. We find nothing in Section 16 to support the proposition that the Commission may unilaterally negate the stay, even briefly, after a filing under that section takes place.
 
 
 12
 Yet that is precisely what, in effect, the Commission would accomplish here if its thesis were to gain favor. The timing of Order No. 1052, as to both its release and its effective operation, narrowed oppressively the time span within which even formal parties to the administrative proceeding could seek reconsideration by a filing during business hours on June 26. The brevity of the span practically foreclosed responsive action on that day by the District of Columbia, the one party petitioning here, whose counsel had to obtain authorization to proceed further. Those not parties but affected by the fare increases[26] -- and the record indicates that they are numerous-- had little or no chance to learn of the order until late in the day, much less to do anything about it before the Commission's weekend closing.[27] Speaking literally, the Commission made it virtually impossible for anyone at all to make an in-hours filing for reconsideration of the hike in fares before it was to achieve reality.
 
 
 13
 We do not presume to prescribe the timing of Commission orders, or to set the Commission's office hours; any thought to the contrary misses the point completely. The Commission, of course, has prerogatives as to such matters, but it has none whatever to thwart a goal which three sovereigns have expressed through the Compact. And when the Commission, however motivated,[28] so fashions a substantial fare increase that the riding public is effectively precluded from seeking reconsideration beforehand during regular business hours, it is hardly in position to support a curtailment of Section 16 rights by the claim that its regular closed hours are inviolate. That argument, urged upon us by the Commission's counsel at 10:30 p.m. on a Saturday night, seemed singularly devoid of appeal.
 
 
 14
 Here all the time schedules were the Commission's and they so concurred that, when affected groups sought promptly to invoke the Commission's rehearing function, its Chairman professed the Commission's inability or unwillingness to respond prior to the advent of higher bus fares in the Washington metropolitan community. That combination of circumstances, we are convinced, violated both the spirit and the letter of Section 16, and imposes on us the obligation to give substance to what it says.[29] We hold that two of the applications for reconsideration became filed with the Commission upon their deposit in the Commission's office and notification of the Chairman thereof. We hold further that, under the circumstances here, the third application became filed with the Commission upon notification of the applicants' wish to file it, and their readiness and willingness to do whatever was necessary to that end. Our ultimate conclusion is that the filing of these applications acted to automatically stay forthwith, by force of Section 16 of the Compact, the operation of Order No. 1052 until such time as the Commission takes final action upon them. Our order accordingly effects the Section 16 stay of Order No. 1052 pending final decision by the Commission on each of the three applications for reconsideration.[30]
 
 
 
 [1]
 See note 26, infra
 
 
 [2]
 We understand that the District of Columbia, as a party to the Commission proceeding, received notice earlier that morning that the order was forthcoming. See, however, text infra at note 26
 
 
 [3]
 The Compact is a tripartite agreement between Maryland, Virginia and Congress for the District of Columbia. It is incorporated into Pub.L. 86-794, 74 Stat. 1031 (1960), set forth following D.C.Code 1-1410 (1967). Amendments thereto are a part of Pub.L. 87-767, 76 Stat. 765 (1962), set forth following D.C.Code 1-1410a (1967)
 
 
 [4]
 'Any person affected by any final order or decision of the Commission may, within thirty days after the publication thereof, file with the Commission an application in writing requesting a reconsideration of the matters involved, and stating specifically the errors claimed as grounds for such reconsideration. No person shall in any court urge or rely on any ground not so set forth in such application. The Commission, within thirty (30) days after the filing of such application, shall either grant or deny it. If such application is granted, the Commission, after giving notice thereof to all interested persons, shall, either with or without hearing, rescind, modify, or affirm its order or decision. The filing of such an application shall act as a stay upon the execution of the order or decision of the Commission until the final action of the Commission upon the application, except that upon written consent of the applicant such order or decision shall not be stayed unless otherwise ordered by the Commission. No appeal shall lie from any order of the Commission until an application for reconsideration has been made and determined.' Compact, supra note 3, tit. II, art. XII, 16
 
 
 [5]
 See note 4, supra
 
 
 [6]
 See note 4, supra
 
 
 [7]
 Adding to the substantial task of preparing hurriedly an application for reconsideration of a complex 36-page fare order was the difficulty some petitioners encountered in securing copies of the order. In two instances copies were finally obtained from a local newspaper, and in at least one of those instances not until the morning of June 27
 
 
 [8]
 Thus petitioners demonstrated satisfaction of the normal condition precedent to a judicial stay, if applicable here at all, 'that application to the agency for the relief sought is not practicable, or that application has been made to the agency and denied. * * *' Fed.R.App.P. 18
 
 
 [9]
 See note 30, infra
 
 
 [10]
 See note 4, supra, and text supra at notes 5-6
 
 
 [11]
 We have jurisdiction to entertain the motions for stay and to afford appropriate relief thereon. See note 20, infra
 
 
 [12]
 See Central Paper Co. v. Commissioner of Internal Revenue, 199 F.2d 902, 904 (6th Cir. 1952); Johansson v. Towson, 177 F.Supp. 729 (M.D.Ga.1959); Hetman v. Fruit Growers Express Co., 200 F.Supp. 234 (D.N.J.1961), aff'd, 3 Cir., 346 F.2d 947 (1965); Freeman v. Giacomo Costa Fu Andrea, 282 F.Supp. 525 (E.D.Pa.1968); Johnson v. Esso Standard Oil Co., 181 F.Supp. 431 (W.D.Pa.1960)
 
 
 [13]
 See text infra at notes 23-25
 
 
 [14]
 Yohalem v. WMATC, 134 U.S.App.D.C. 77, 412 F.2d 1125 (1969)
 
 
 [15]
 Section 16 of the Compact requires filing of the application within 30 days after publication of the order of which reconsideration is sought. See note 4, supra
 
 
 [16]
 Yohalem v. WMATC, supra note 14, 134 U.S.App.D.C. at 78, 412 F.2d at 1125
 
 
 [17]
 Id
 
 
 [18]
 Owens-Illinois Glass Co. v. District of Columbia, 92 U.S.App.D.C. 15, 204 F.2d 29 (1953); Valley Broadcasting Co. v. FCC, 99 U.S.App.D.C. 156, 159, 237 F.2d 784, 787 (1956)
 
 
 [19]
 Yohalem v. WMATC, supra note 14, 134 U.S.App.D.C. at 79, 412 F.2d at 1126
 
 
 [20]
 Normally, Commission action on reconsideration must forerun judicial action on review. Section 16 of the Compact provides that 'no appeal shall lie from any order of the Commission until an application for reconsideration has been made and determined.' That section also provides that 'no person shall in any court urge or rely upon any ground not' specifically identified as a basis for Commission reconsideration. Thus our authority over orders of the Commission ordinarily rests upon the filing of an application requesting reconsideration and and a final decision by the Commission thereon. However, as Yohalem makes clear, we have jurisdiction to determine whether the Commission erred in its treatment of a tendered application for reconsideration and, if it did, power to take appropriate remedial action. To conclude otherwise would expose litigants to the possibility that they could not obtain judicial review simply because the Commission mishandled an event critical to our jurisdiction
 
 
 [21]
 Yohalem v. WMATC, supra note 14, 134 U.S.App.D.C. at 79, 412 F.2d at 1126
 
 
 [22]
 While the application of the two joint petitioners was not physically deposited in the Commission's closed office, the Chairman of the Commission made it plain that such a deposit would not be deemed a filing prior to the reopening of the Commission's office. That being so, we perceive no sound reason why those petitioners should not be treated like the other petitioners insofar as a Section 16 filing is concerned
 
 
 [23]
 In the main, that is also the Commission's interpretation, but with the qualification that the Commission must examine the proffered application, to ascertain whether it suitably particularizes errors in the contested order, before the application becomes filed. We cannot accept the Commission's caveat. Our reading of Section 16 leads us to conclude that such an examination is appropriately related to the Commission's consideration of the application on the merits, and consequently to the Commission's decision thereon, but that what otherwise amounts to a filing is effective without such an examination. Our view abides the general understanding that the deposit of an instrument for filing in the proper office constitutes a filing irrespective of its legal shortcomings or possible inefficacy as a filed document. And certainly the activities here produced a filing without regard to any required action the Commission omitted thereafter. Blair v. Cleveland, C.C. & St. L. Ry., 45 F.2d 792, 794 (E.D.Ill.1931), aff'd, 59 F.2d 478 (7th Cir. 1932) (failure to indorse document as filed); People v. Ramirez, 112 Cal.App. 507, 297 P. 51, 52 (1931) (clerk's failure to file after receipt for filing); Tomlinson v. Tomlinson, 121 Kan. 206, 246 P. 980, 982 (1926) (failure to indorse document as filed); Landis v. Hawkins, 290 Mo. 163, 234 S.W. 827, 829 (1921) (failure to then indorse document as filed); Golden v. McKim, 45 Nev. 350, 204 P. 602, 603 (1922) (document mislaid or lost). See also In re Annexation of Certain Territory, 138 Ind.App. 207, 212 N.E.2d 393, 396, 213 N.E.2d 349 (1965)
 
 
 [24]
 See note 4, supra
 
 
 [25]
 The maximum period a Section 16 stay may endure is 60 days, since the application must be filed within 30 days after publication of the order, and the Commission must take action on the application within 30 days after its filing. See note 4, supra
 
 
 [26]
 While only a 'party to a proceeding under (the Compact) aggrieved by an order issued by the Commission in such proceeding may obtain (judicial) review of such order.' Compact, supra note 3, tit. II, art. XII, 17(a), 'any person affected by any final order or decision of the Commission may' seek reconsideration of the order by the Commission. Compact, 16. It is beyond question that Order No. 1052 is 'final' within the meaning of Section 16
 
 
 [27]
 See also note 7, supra
 
 
 [28]
 The timing of Order No. 1052 has been characterized before us as a deliberate but transparent attempt to obstruct public redress in a matter the Commission is charged with regulating in the public interest. At the hearing, the Commission advanced its practice of making fare orders effective on Sundays and D.C. Transit's precarious financial condition as reasons for timing Order No. 1052 as it did. We need not enter the debate, for the simple answer to the Commission's response is that Section 16 of the Compact confers a right to reconsideration and specifies unequivocally the restraint generated by the filing of an application therefor, and thus disables the Commission from striking a different balance
 
 
 [29]
 Yohalem v. WMATC, supra note 14; Owens-Illinois Glass Co. v. District of Columbia, supra note 18, 92 U.S.App.D.C. at 18, 204 F.2d at 32
 
 
 [30]
 Our duty here, as we conceive it, is to exact compliance with Section 16, which has already balanced the equities of the parties as to a stay. Cf. Virginia Petroleum Jobbers Ass'n v. FPC. 104 U.S.App.D.C. 106, 110-112, 259 F.2d 921, 925-927 (1958). Were we to look beyond Section 16, we could not fail to note that even by the Commission's theory a filing of the applications for reconsideration would in all probability be required promptly after reopening of its office on June 29, with a concomitant Section 16 stay. We would be hard put to justify the extremely brief operation of Order No. 1052 from midnight June 27-28 until midmorning June 29, with its wake of widespread dislocations-- most severely among the poor